MOTORISTS MUTUAL INSURANCE
COMPANY, Appellant

v.

RSJ, INC., d/b/a Regency One Hour Cleaners; Century Pension Income Fund XXIII; Fox Partners V, Its General Partner, Appellees.

No. 95–CA–0367–MR.

Court of Appeals of Kentucky.

June 21, 1996.

As Modified July 19, 1996 and Aug. 2, 1996.

James D. Ishmael, Jr., Kerry T. Cauthen, Wyatt, Tarrant & Combs, Lexington, for Appellant.

James T. Gilbert, Coy, Gilbert & Gilbert, Richmond, for Appellee RSJ, Inc.

Perry M. Bentley, Todd S. Page, Stoll, Keenon & Park, Lexington, for Appellees Century Pension Income Fund XXIII and Fox Partners V, its General Partner.

Before GARDNER, JOHNSON and JOHNSTONE, JJ.

## OPINION

JOHNSTONE, Judge.

At issue is the proper construction to be given a "pollution exclusion" contained in a commercial general liability policy issued by appellant. In a declaratory judgment proceeding, the trial judge rejected the insurer's attempt to escape liability for damages stemming from exposure to carbon monoxide fumes due to a leak in the vent stack of the insured's boiler. The trial judge based her refusal to give effect to the exclusion upon a finding that the policy language is ambiguous, citing the rationale utilized by a North Carolina court construing an identical exclusion under comparable circumstances. Finding no error in the decision of the trial judge, we affirm.

The facts are not in dispute. Appellee, RSJ, Inc., operates a dry cleaning business in a strip shopping center in Lexington, Kentucky. The various businesses in the center share a common attic. A vent pipe from a boiler used in the dry cleaning business passes through the attic space. Immediately

adjacent to the dry cleaning business is an entity known as All Alterations, operated by Ferdos and Maher Madhat. In an action lodged in the Fayette Circuit Court, the Madhats alleged that they sustained bodily injury due to the release of carbon monoxide from a leak in the vent stack of a boiler utilized by the dry cleaner.

The appellant insurer had issued to RSJ a commercial general liability policy which contained a standard exclusionary clause, commonly referred to as a "pollution exclusion." The insurer denied coverage for the injuries sustained by the Madhats on the basis of the exclusionary provision. RSJ thereafter instituted this action in the Madison Circuit Court seeking a declaration that coverage should be afforded under the policy. The trial judge entered summary judgment requiring the insurer to defend RSJ in the suit arising from the inadvertent release of carbon monoxide during the course of RSJ's normal business activities and later awarded attorney's fees incurred to date in defending the Fayette County action.

The insurer argues in this appeal that because the language of the Madhats' complaint mirrors the exclusionary language in the policy, the trial judge erred in failing to give effect to the provision. It also attempts to distinguish the case relied on by the trial judge, *West American Insurance Company v. Tufco Flooring East, Inc.*, 104 N.C.App. 312, 409 S.E.2d 692 (1991), and cites several recent opinions supporting its position. The insurer also complains that the trial judge failed to define in what way the provision is ambiguous.

We preface our examination of this issue with a recognition of the basic principles of construction articulated by the Kentucky Supreme Court in *St. Paul Fire & Marine Insurance Company v. Powell–Walton–Milward, Inc.*, Ky., 870 S.W.2d 223 (1994):

Where an exclusion is susceptible to two reasonable interpretations, the interpretation favorable to the insured is adopted. *Foster v. Allstate Ins. Co.*, Ky.App., 637 S.W.2d 655 (1981).

The rule of strict construction against an insurance company certainly does not mean that every doubt must be resolved against it and does not interfere with the rule that the policy must receive a reasonable interpretation consistent with the parties' object and intent or narrowly expressed in the plain meaning and/or language of the contract. Neither should a nonexistent ambiguity be utilized to resolve a policy against the company. We consider that courts should not rewrite an insurance contract to enlarge the risk to the insurer. *U.S. Fidelity & Guar. Co. v. Star Fire Coals, Inc.*, 856 F.2d 31 (6th Cir.1988).

An ambiguity may either appear on the face of the policy or, in this case, when a provision is applied to a particular claim.

*St. Paul Insurance*, 870 S.W.2d at 226–27 (emphasis added).

The provision at the core of the controversy is what has become known as an "absolute pollution exclusion," which the policy sets out in the following terms:

Section I—Coverages

Coverage A. Bodily injury and property damage liability.

2. Exclusions

This insurance does not apply to:

. . . .

f. (1) "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants:

(a) At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to any insured;

. . . .

Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

Because there is nothing inherently ambiguous in the language employed, any ambiguity necessarily arises in the application of the provision to the specifics of a particular claim. *St. Paul Insurance, supra.* We

agree with the trial judge that the "pollution exclusion" in this policy proves ambiguous when applied to the incident giving rise to this appeal.

In construing a question of first impression in this Commonwealth, we find instructive the experience of other jurisdictions which have grappled with the issue. Consider, for example, the reasoning advanced by the Maryland Court of Appeals in *Sullins v. Allstate Insurance Company*, 340 Md. 503, 667 A.2d 617, 624 (1995), in rejecting on the basis of ambiguity application of an identical pollution exclusion for damages incurred through exposure to lead paint:

> Some courts hold that the existence of conflicting judicial interpretations of insurance policy terms is evidence of ambiguity, while others hold such conflict is not conclusive. (Citations omitted).
>
> . . . .
>
> We hold that conflicting interpretations of policy language in judicial opinions is not determinative of, but is a factor to be considered in determining the existence of ambiguity. In interpreting an insurance policy, we must follow the rules of contract construction set out in part II of this opinion. However, if other judges have held alternative interpretations of the same language to be reasonable, that certainly lends some credence to the proposition that the language is ambiguous and must be resolved against the drafter.

That such diversity exists throughout the country is borne out not only in the authority cited in this appeal, but in "Construction and Application of Pollution Exclusion Clause in Liability Insurance Policy," 39 A.L.R. 4th 1047. Like the court in *Sullins*, however, we perceive the split in authority to be but one factor to be evaluated in passing on the ambiguity of the exclusion.

■ A second factor relevant to our inquiry is the basic premise that terms used in insurance contracts "should be given their ordinary meaning as persons with the ordinary and usual understanding would construe them." *City of Louisville v. McDonald*, Ky. App., 819 S.W.2d 319, 320 (1991). The drafters' utilization of environmental law terms of art ("discharge," "dispersal," "seepage," "migration," "release," or "escape" of pollutants) reflects the exclusion's historical objective— avoidance of liability for environmental catastrophes related to intentional industrial pollution. The New Jersey Supreme Court in *Morton International, Inc. v. General Accident Insurance Company*, 134 N.J. 1, 629 A.2d 831 (1993), makes the following observations:

> Foreseeing an impending increase in claims for environmentally-related losses, and cognizant of the broadened coverage for pollution damage provided by the occurrence-based, CGL policy, the insurance industry drafting organizations began in 1970 the process of drafting and securing regulatory approval for the standard pollution-exclusion clause. "The insurer's primary concern was that the occurrence-based policies, drafted before large scale industrial pollution attracted wide public attention, seemed tailor-made to extend coverage to most pollution situations." *Rosenkranz, supra,* 74 Geo. L.J. at 1251. Commentators attribute the insurance industry's increased concern about pollution claims to environmental catastrophes that occurred during the 1960s. "Pollution claims burst on the insurance scene following the Torrey Canyon disaster and the Santa Barbara off-shore drilling oil spills in 1969." Hourihan, *Insurance Coverage for Environmental Damage Claims,* 15 Forum 551, 533 (1980). Other commentators observe that the insurance industry, concerned about public reaction to environmental pollution, desired to clarify and publicize its position that CGL policies did not indemnify knowing polluters. *Reiter et al., supra,* 59 U. Cin. L.Rev. at 1195–56. Consistent with that objective, the President of INA announced his company's intention to adopt the pollution-exclusion endorsement with these comments:
>
>> INA will continue to cover pollution which results from an accidental discharge of effluents—the sort of thing that can occur when equipment breaks down.
>>
>> We will no longer insure the company which knowingly dumps its wastes.

. . . .

The end-product of the IRB's drafting effort was the standard pollution-exclusion clause, which became known as exclusion "f" of the standard form CGL policy. According to one member of the drafting committee, the pollution-exclusion clause allowed the underwriters "to perform their traditional function as insurers of the unexpected event or happening and yet... [did] not allow an insured to seek protection from his liability insurers if he knowingly pollute[d]."

*Morton International, Inc.*, 629 A.2d at 849–51. A similar perspective of the "pollution exclusion" was advanced by the court in *United Pacific Insurance v. Van's Westlake Union*, 34 Wash.App. 708, 664 P.2d 1262 (1983), in holding that the provision was meant solely to deprive coverage to active polluters and did not apply where the damage caused was neither expected nor intended.

Given this historical perspective and the continued use of environmental law terminology, we are convinced that an ordinary business person would not apprehend the provision as excluding coverage for the type of damage incurred through an unexpected leak in a vent pipe. Thus, the trial judge did not err in declaring the provision to be ambiguous as applied to the facts of this case.

Finally, we adopt the reasoning set out in *Sullins, supra*, as to the absurd consequences that would result from a blind application of the literal terms of the pollution exclusion:

The terms "irritant" and "contaminant," when viewed in isolation, are virtually boundless, for "there is virtually no substance or chemical in existence that would not irritate or damage some person or property." Without some limiting principle, the pollution exclusion clause would extend far beyond its intended scope, and lead to some absurd results. Take but two simple examples, reading the clause broadly would bar coverage for bodily injuries suffered by one who slips and falls on the spilled contents of a bottle of Drano, and for bodily injury caused by an allergic reaction to chlorine in a public pool. Although Drano and chlorine are both irritants and contaminants that cause, under certain conditions, bodily injury or property damage, one would not ordinarily characterize these events as pollution. . . .

Therefore, just as a reasonably prudent layperson might not consider Drano to be a "pollutant" or "contaminant," so might a reasonably prudent layperson not consider lead paint to be a "pollutant" or "contaminant."

*Sullins*, 667 A.2d at 621–22.

The decision to follow the rationale of case law such as *Sullins*, which narrowly construes the "pollution exclusion," implicitly refutes the insurer's contention with respect to the trial court's reliance on *West American, supra*. While that case obviously contains factors that are distinguishable from the instant case, the portion of the opinion cited by the trial judge clearly reflects what we perceive to be the better-reasoned view.

In sum, our review of the authority cited by appellant has simply failed to persuade us to adopt its view of the exclusion. The cases relied upon are either distinguishable because they deal with environmental pollution (*e.g.*, *Constitution State Insurance Company v. Iso–Tex, Inc.*, 61 F.3d 405 (5th Cir.1995); *Northbrook Indemnity Insurance Company v. Water District Management Company*, 892 F.Supp. 170 (1995)) or simply adhere to a position we deem inappropriate for adoption as the rule in this Commonwealth (*e.g.*, *Bernhardt v. Hartford Fire Insurance Company*, 102 Md.App. 45, 648 A.2d 1047 (1994)).

The judgment of the Madison Circuit Court is affirmed.

All concur.